# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## GILL v. BARBOUR.

### JANUARY 8th, 1885.

1. JUDICIAL SALES—*Purchase-money paid into court and lost.*—Where purchaser at judicial sale buys in all the liens save one, and is allowed credit therefor, and then to prevent re-sale, pays into bank, with approval of the court, the amount of the said lien, which the court recognizes as appropriated to the owners of the said lien, and which is later lost by the bank's failure, the loss will fall wholly on the owners of the said lien. Had there remained more than one unsatisfied lien, the loss would then have fallen on the general fund, and been borne by the lienors in the inverse order of the priority of their liens.

Appeal of N. R. Gill and J. T. H. Bringman, trustees for J. G. Hewes and J. G. Miller, from three decrees of circuit court of Fauquier county, entered December 23d, 1876, April 15th, 1879, and December 15th, 1881, respectively, in five chancery causes heard together; four in the short style of *Barbour* v. *Barbour*, and one in the short style of *Miller* v. *Miller*.

Opinion states the case.

*J. G. & W. W. Field, J. Y. Menefee,* and *G. D. Gray,* for the appellants.

*John F. Rixey, W. W. Henry,* and *J. C. Gibson,* for the appellees.

LACY, J., delivered the opinion of the court.

In the suits of Barbour v. Barbour a tract of land called "Fleetwood," situated in the county of Culpeper, was ordered

to be sold; and on the 21st of August, 1855, the said tract of land was sold to Henry Miller, at the price of $30,000, by special commissioners of the court. This sale was reported to court and confirmed.

In 1862 Henry Miller died intestate, leaving $3,055.07 of the purchase-money for this land still unpaid.

In April, 1866, J. G. and H. B. Miller & Co. and other creditors of Henry Miller instituted a chancery suit in the circuit court of Culpeper to subject the real estate of Henry Miller to the payment of his debts, the personal estate proving insufficient; and Barbour and Thompson, the special commissioners of the circuit court of Fauquier, who had made the sale of "Fleetwood" to Henry Miller, were made parties defendants. The bill was a general creditors' bill, and set forth that the whole of the purchase-money for "Fleetwood" had been paid.

In June, 1866, a decree was entered in this suit for accounts, it not appearing to the court that Henry Miller had fully paid the purchase-money for "Fleetwood."

In November, 1866, the Barbour suits were removed from the circuit court of Fauquier to the circuit court of Culpeper, and there docketed, and ordered to be heard with the suit of Miller v. Miller.

In the same month a decree was entered for the sale of "Fleetwood," to pay the debts of Henry Miller, and commissioners appointed to make the sale, an account ordered of the balance due to the commissioners of the court in the Barbour suits, Barbour and Thompson, and the purpose of the court declared to pay to them the balance due them out of the proceeds of the sale of "Fleetwood."

Menefee and Gibson were appointed commissioners of the court to make the sale, and on the 16th of September, 1867, they sold "Fleetwood" to J. G. Miller, at the sum of $26,590.50, which sale was reported to and confirmed by the court on the 9th of November, 1867. J. G. Miller was the largest creditor of Henry Miller, holding a trust-deed lien of $13,000 on

"Fleetwood." He became the owner of the other debts against Henry Miller by purchase, and the same were assigned to him, except the lien due on the original purchase by Henry Miller in the Barbour suits. This amount is called in the subsequent proceedings the Barbour lien.

In April, 1874, a decree was entered in the causes, confirming the report of the commissioner as to the amount of the Barbour and other liens, and commissioners Menefee and Gibson directed to collect the balance of the purchase-money due upon the purchase of "Fleetwood," allowing J. G. Miller to retain so much of the said purchase-money as he was entitled to by purchase. And they were directed to deposit the money so collected in the Bank of Culpeper. On May 1st, 1874, the same commissioners were directed not to deposit this money when collected in the said bank, but to pay it to the court commissioners in the Barbour suits, Barbour and Thompson, upon the execution by the said Barbour and Thompson of a bond, in the penalty of $10,000, properly conditioned, it being a matter in controversy whether this money belonged to the devisees of Mrs. Barbour's father, James Byrne, or to the creditors of Mrs. Barbour; and a reference was had to a commissioner to ascertain and report upon that question.

After a rule against J. G. Miller to show cause against it, at the February term, 1875, a decree was entered upon the return of the rule, directing J. G Miller to pay this money to the commissioners of the court, Menefee and Gibson, within sixty days, in default of which the said commissioners were directed to sell "Fleetwood" again, and the decree directing the payment to commissioners Barbour and Thompson was set aside as to that direction.

In the meantime J. G. Miller had sold "Fleetwood" to J. G. Hewes, and at the request of said Hewes conveyed the same to the appellants, Gill and Bringman. And at the April term, 1875, the said trustees filed their petition in the cause, setting forth the fact that they had become the purchasers of "Fleet-

wood"; had assumed the payment of the Barbour lien still subsisting thereon; that they were prepared to pay the same, amounting on that day to $5,450.18, and had deposited that sum in the Bank of Culpeper, taking a certificate for the same; praying the court to receive, and disburse as was right the same, and set aside the decree of the February term directing a resale to pay the said lien, and that they be relieved of the lien of the said Barbour debt. The Bank of Culpeper was in the town of Culpeper, in which the court was then being held.

On the 6th of April the court, by decree in the cause, gave the petitioners leave to file their petition and the said certificate of deposit, and set aside the decree which had been entered in the cause at the February term preceding, to sell the said land to satisfy the said Barbour lien; and on the next day, by its order, drew out of the said bank $500 of the said sum of money so deposited to pay to the said commissioners, Menefee and Gibson, their commissions then unpaid on the said sale.

On the 5th of July following the causes were, by decree entered therein, removed to the circuit court of Fauquier for further proceedings to be had therein.

On the 24th of December, 1875, the circuit court of Fauquier entered a decree directing one of the said commissioners of the court, Gibson, to withdraw from the papers in the causes the certificate of the Bank of Culpeper, and to collect the same.

The Bank of Culpeper was unable to pay the said sum, and it was lost.

Where does the loss fall—on those entitled to the Barbour lien, or on the purchasers of the land—the appellants? The circuit court of Fauquier, by its decree of December 23d, 1876, held that the sum of $5,450.18, paid in cash in the Bank of Culpeper, was received by the circuit court of Culpeper as a payment on account of the purchase-money of the realty called "Fleetwood" due by J. G. Miller, the purchaser thereof, and was a credit to these causes in said bank, and that the said sum not having been appropriated by decree made subsequently

to said 5th day of April, 1875, to any claim to any party to these causes (save and except a portion thereof paid to the commissioners of sale for their commissions), if the same be lost by the insolvency of said bank, such loss is to be borne by the general fund in the causes, and not to fall upon the devisees of James Byrne, deceased; and that the Barbour lien is still due and unpaid, and is the first lien upon the land called "Fleetwood." By the decree of April, 1879, the court received and dismissed the petition of the appellants for a rehearing, and by the decree of December, 1881, decreed a sale of "Fleetwood," to satisfy the Barbour lien, that appearing to be the only lien unsatisfied.

From these decrees the appellants applied for and obtained an appeal to this court, which was awarded July 14th, 1882.

The sole question in this cause in dispute in this court is whether the loss of this fund in the Bank of Culpeper, deposited in the bank under the foregoing circumstances, should fall on the purchaser or on the creditor.

It cannot be maintained, as is strenuously insisted by the appellees, that this is a contest between the lienors; that as to the purchaser, he has been credited with the money he has paid in the Bank of Culpeper to the order of and with the approval of the court, and that thus there is no controversy with him as purchaser of the land in regard to that sum.

That argument omits the important element in the question— that he has not only paid this part of the purchase-money, but that he has paid the entire purchase-money, in the manner approved by the court. The commissioners were directed to allow him credit for the debts he had become the owner of, and to collect of him the balance of the purchase-money, accurately described and determined by a master's report in the cause; and a rule was awarded against him to show cause why the land should not be resold to pay this particular sum of money, and a decree was entered directing him to pay this sum, the balance of the purchase-money, within sixty days. This sum was

not only the purchase-money, but all the purchase-money with which the court could charge him or decree against him. He came into court, and paid the purchase-money into court, and the court took charge of it, and held it, for reasons which were doubtless deemed judicious, and dispensed a part of it, and proceeded to collect the residue, when the bank failed. The money was in the hands of the court in effect, and this is conceded by the argument, for it is not held that the loss should fall on the purchaser as if no payment was made at all, but it is held that the purchaser as such is discharged of so much, and the payment is thus admitted, and its receipt by the court conceded, and the loss is held to fall on the lien-holders in the inverse order of their priorities.

But in this case there was no other and is no other lien on this land nor on the purchase-money than this one, which was satisfied by payment in full. If the bank had not failed, there is and could be no other claimant for this fund than the holders of the Barbour lien; the other liens have been paid by the purchaser, and extinguished. It is true that the payment of a junior lien would be without prejudice and without effect on a senior lien; the superior lien was so before the payment of any junior lien, and so remained after the payment of the junior lien obviously; and it is not in point to argue that the senior lien cannot be prejudiced by the payment of the junior lien. It is admitted by the appellants that the payment of the junior liens had no effect whatever on the first lien.

But it is admitted that the first lien remained subsisting in full force and effect after the junior lien had been paid off and discharged—the purchaser having found it to his interest to pay the other liens, did not deny the obligation of the first lien, but admitted it. And when the court, recognizing the payment of all the other liens, decreed a sale of the land to satisfy this first lien, the purchaser came forward to prevent the sale of his land, and paid that to the court's receiver. It was a payment of the money into court, and a discharge of the balance of the

purchase-money—it was then the first as it was the only lien upon the land, and upon its payment the order for the resale was set aside. If it was only a payment on account of liens, as is now held by the circuit court, and was not a payment in full of all liens, why was the order of sale set aside? The first lien having been paid, why not proceed to sell for the other unpaid liens, if any? This lien having been paid, the next lien became the first, and so on in their order all the liens came up for recognition.

Obviously the Barbour lien was then the only lien claimed against the land, the others having been paid and satisfied—that was the purchase-money; and when the purchase-money was duly paid into court or to the receiver of the court the purchaser was entitled to be discharged from it, and to receive a deed for the land, he having paid the purchase-money in full. And the decree of the circuit court being in effect to require this purchaser to insure the money in the hands of the court, into which he has been compelled by its process to pay it, is erroneous, and should be reversed and annulled.

The special commissioners of the court were, however, entitled to their commissions of $551, with interest thereon from November 9th, 1867, out of the fund before distribution. The effect of the decree of April 5th, 1875, was to withdraw this sum from the debt due under the first lien. It cannot be placed there; but if the fund is insufficient to pay all the debts, it must fall upon the fund belonging to the creditors of the lowest class; and as the appellants have assumed the obligation of these debts, this sum of $551, with interest, must be paid by them to the appellees, who are entitled to the Barbour debt, who have paid this sum to the said commissioners, and this cause should be remanded to the circuit court of Fauquier county for decree to that end.

DECREE REVERSED.